UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

Plaintiff,

v.

Gabriel Adam Alexander Luthor (1) and
Elizabeth Christine Brown (2),

Defendants.

File No. 25-cr-88 (ECT/LIB)

**OPINION AND ORDER**

---

Matthew D. Forbes and Matthew Paulbeck, United States Attorney's Office, District of Minnesota, Minneapolis, MN, for Plaintiff United States of America.

Thomas C. Plunkett, Attorney at Law, St. Paul, MN, for Defendant Gabriel Adam Alexander Luthor.

Andrew S. Garvis, Koch & Garvis, Minneapolis, MN and Erica E. Davis, Davis and Egberg, PLLC, Minneapolis, MN, for Defendant Elizabeth Christine Brown.

---

Defendants Gabriel Adam Alexander Luthor and Elizabeth Christine Brown were indicted on six counts of aiding and abetting wire fraud in violation of 18 U.S.C. § 1343 and one count of money laundering in violation of 18 U.S.C. § 1957. The case is scheduled for trial beginning Monday, November 2, 2026. In anticipation of trial, the Government and Defendants filed motions in limine. The Government filed two motions, *see* ECF Nos. 154–55, and Defendants filed fourteen joint motions, *see* ECF Nos. 133–46.

A pretrial conference was held on October 21, 2026, at which Defendants' joint motions in limine 5, 7, 8, 10, and 11 [ECF Nos. 137, 139–40, 142–43] were resolved. *See*

ECF No. 164 (minute entry). Decisions on Defendants' Joint Motion in Limine 3 to Exclude Undisclosed Expert Testimony [ECF No. 135] and Joint Motion in Limine 9 to Preclude Overview and Case-Agent Opinion Testimony [ECF No. 141] will be deferred until the issues arise at trial. This Opinion and Order addresses the remaining motions.[1]

*Government's Motion in Limine 1*

The Government moves to admit evidence of Defendants' "lavish spending and extravagant lifestyle as evidence of motive and unexplained wealth." ECF No. 154 at 1. The Government also seeks to admit evidence of Defendant Luthor's "godlike status" among Brown and others to show his control over his alleged co-conspirators. *Id.* at 8. The motion will be granted subject to the limitations described below.

The Government seeks to introduce evidence that Defendants used fraud proceeds to purchase and renovate their "million-dollar Eden Prairie Mansion"; to spend exorbitantly at night clubs, "sometimes spending more than $42,000 in a single night"; and to purchase other luxuries, such as a $400,000 Rolls Royce, multiple BMWs, "box seats at Vikings and Timberwolves games," and travel via private jet and limousine. *See id.* at 2, 7. "Unexplained evidence of wealth subsequent to the commission of a crime is relevant and generally admissible in the district court's discretion, even in the absence of direct proof of a defendant's prior impecuniousness." *United States v. Rodriguez*, 484 F.3d 1006, 1012 (8th Cir. 2007). "This is because 'the sudden, unexplained acquisition of wealth is

[1] After the pretrial conference, the Government filed an additional motion [ECF No. 166], as did Defendant Luthor [ECF No. 171]. These motions will be addressed in separate orders.

competent evidence supporting proof of guilt in larceny or crimes involving a motive of enrichment.'" *United States v. Wesley*, 648 F.3d 640, 645 (8th Cir. 2011) (quoting *United States v. Crisp*, 435 F.2d 354, 360 (7th Cir.1970)). "Such evidence is competent because the sudden and unexplained presence of wealth supports an inference that the wealth is the fruit of the crime for which the defendant stands accused." *Id.* That said, courts must be mindful of the concerns addressed by Federal Rule of Evidence 403 and determine the point at which the probative value of unexplained-wealth evidence is substantially outweighed by a risk of unfair prejudice or the evidence becomes needlessly cumulative.

The Government cites the Sixth Circuit's framework in *United States v. Jackson-Randolph* for determining whether evidence of unexplained wealth is relevant and not unfairly prejudicial. 282 F.3d 369 (6th Cir. 2002). The Eighth Circuit has not adopted this (or a similar) framework, but I'll apply the *Jackson-Randolph* framework here because it represents a logical, useful approach to weighing the relevance of the wealth evidence against its potential for unfair prejudice, because the parties rely on the framework to argue their positions, and because the framework is not inconsistent with any Eighth Circuit authorities. In *Jackson-Randolph*, the Sixth Circuit explained:

> [U]nfair prejudice does not outweigh the probative value if three factors are met: (1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity. Then the evidence would have been properly admitted to demonstrate, not just motive, but also a likelihood that the extra wealth came from illegitimate sources and to support an inference that the defendant committed the alleged crime.

282 F.3d at 378. Applying these factors in *Jackson-Randolph*, the Sixth Circuit determined that the district court did not err in admitting evidence of the defendant's "purchases of expensive jewelry, clothing, and several fur coats," her "trips to Aruba, the Bahamas, Las Vegas, and Atlantic City for gambling," and her "propensity to give away expensive gifts such as jewelry, clothing, and trips." *Id.* at 376, 378–79.

Here, applying the first *Jackson-Randolph* factor, there is other credible evidence of illegal activity beyond Defendants' wealth and spending. The Government intends to introduce testimony, medical and billing records, text messages, emails, and other communications that it contends will demonstrate that, at Defendants' direction, Golden Victory Medical (or "GVM") consistently billed for services that were never rendered, including after the Centers for Medicare & Medicaid Services ("CMS") suspended Medicare payments to GVM on suspicion of fraud and after an independent audit of GVM's billing practices revealed significant inaccuracies. *See* ECF No. 149 at 8–10, 18–22. Applying the second and third factors, the Government intends to present evidence from which the jury could conclude the money spent was not available to the Defendants from a legitimate source during the period of the alleged illegal activity. For instance, the Government intends to produce the financial records of GVM, Luthor, and Brown during the period of GVM's operation. *See* ECF No. 150 at 23–25; ECF No. 154 at 7. The Government also intends to call Brown's sister as a witness to testify that "when [Brown] first met Luthor, Brown was living modestly following a divorce, and Luthor drove a 'clunker' car and worked at Kohls." ECF No. 157 at 23. Further, the Government will

introduce records and communications showing that after Medicare suspended payments to GVM, Defendants were forced "to sell off many of their luxury items (including the $400,000 Rolls Royce) and cease using a limo driver and other extravagant services." ECF No. 149 at 20. Defendants' contention that the relevance of wealth evidence hinges on "[w]hether any particular expenditure is traceable to a fraudulent claim" is not supported by *Jackson-Randolph* and other cases applying similar factors. ECF No. 156 at 16. "While demonstrating a direct connection would certainly enhance the probative value of such evidence, it is not necessary." *Jackson-Randolph*, 282 F.3d at 379; *cf. United States v. Cardena*, 842 F.3d 959, 984 (7th Cir. 2016) ("That does not mean that lack of a legitimate source of income must be *undisputed*. A dispute as to the legitimacy . . . goes to the weight, not the admissibility of the government's unexplained-wealth evidence."). Evidence showing the unusually steep rise and fall of Defendants' wealth over the same period as GVM's allegedly fraudulent billing makes it more probable that Defendants' wealth was derived from fraud. The Government has established the relevancy of Defendants' wealth and spending.

Regardless, Defendants' concern that "[e]vidence of the make and price of the car, the dollar amount of a bar tab, [and] the existence of an indoor basketball court, a waterfall, box seats, and private jets" goes too far is well-taken. ECF No. 156 at 17. Allowing the Government to introduce unlimited-wealth evidence without guardrails risks prejudicing the jury based on the faulty premise that Defendants' spending habits alone are indicative of criminal activity. Therefore, I find it necessary to mitigate the risk of cumulative wealth

evidence and unfair prejudice to the Defendants by granting the Government's motion with certain parameters. The Government may introduce evidence of Defendants' wealth and spending but may do so only in the aggregate by category. As a hypothetical, instead of introducing evidence that Defendants purchased a Rolls Royce for $400,00 and a BMW for $75,000, the Government may introduce evidence that Defendants spent $475,000 on two automobiles. As another hypothetical, rather than introducing evidence that Defendants spent $100,000 on an indoor basketball court, the Government may introduce evidence showing the total amount Defendants spent on home renovations over the course of one or more years. Within those parameters, the Government's Motion in Limine Regarding Wealth Evidence [ECF No. 154] will be granted.

The Government also seeks to admit evidence tending to show Luthor's control over Brown and his alleged co-conspirators. ECF No. 154 at 8. Specifically, the Government intends to introduce text messages showing Brown praising Luthor as a "God," "THE Great one," and using other like terms. *Id.* at 4. The Government argues that "evidence that Brown and other members of the criminal scheme viewed Luthor as a god-like figure, and turned over much of their decision-making to Luthor, is relevant to show Luthor's involvement in the fraud scheme and power over other members." *Id.* at 9. While Defendants may be correct that, unlike the cases cited by the Government, this case involves "no conspiracy count, no RICO count, no enterprise, and no charge in which hierarchy, coercion, or control is an element," ECF No. 156 at 19, I am persuaded that these statements are probative of Luthor's role in the charged offenses. The charged counts show

why this is so. Four of the six wires are messages Brown sent to others involved with GVM. ECF No. 1 at 22. None of the wires explicitly involve Luthor. The Government's theory of Luthor's involvement is that he was at the helm giving orders to Brown to increase revenues, which she "dutifully acted upon . . . in the form of billing and scheduling decisions" on behalf of GVM. ECF No. 154 at 10. Evidence of Luthor's control and status among co-conspirators is therefore relevant to proving Luthor's culpability.[2]

As with wealth evidence, there is a point at which statements about Luthor's "god-like" status or control might become needlessly cumulative or at which their probative value might be diminished in comparison to the risk of unfair prejudice. The Government assured the Court and Defendants at the pretrial conference that the number of statements related to Luthor's status it seeks to introduce is limited. Therefore, the Government's Motion in Limine Regarding Evidence of Luthor Control and Power Over Brown and Others [ECF No. 154] will be granted with the understanding that needlessly cumulative evidence will be excluded.

*Government's Motion in Limine 2*

The Government moves to introduce "text messages and emails from uncharged conspirators . . . that were made during, and in furtherance, of (i) the wire fraud scheme charged in the indictment and (ii) an uncharged conspiracy to defraud Medicare and other

---

[2] Defendants point out that "[t]he statements at issue are Ms. Brown's texts about Mr. Luthor" and "[o]ffered against Mr. Luthor for their truth . . . they are hearsay unless the government first satisfies Rule 801(d)(2)(E)," the co-conspirator exclusion from the rule against hearsay. ECF No. 156 at 21. Pursuant to a different ruling in this Order, Brown's statements will be conditionally admitted. *See infra* Government's Motion in Limine 2.

insurance providers." ECF No. 155 at 9–10. The parties agree that the procedure for admitting co-conspirator statements outlined in *United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978) applies. *See* ECF No. 155 at 9, 10–11; ECF No. 156 at 13–14. Defendants, however, ask the Court to order the pretrial disclosure of all co-conspirator evidence. ECF No. 156 at 13–14.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay if "[t]he statement is offered against an opposing party." Fed. R. Evid. 801(d)(2)(E); *see Bell*, 573 F.2d at 1043 ("It is well-established that an out-of-court declaration of a coconspirator is admissible against a defendant if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy."). *Bell* explains that, "upon a timely and appropriate objection by the defendant," a district court may conditionally admit the statement while cautioning the parties on the record

> (a) that the statement is being admitted subject to defendant's objection; (b) that the government will be required to prove by a preponderance of the independent evidence that the statement was made by a coconspirator during the course and in furtherance of the conspiracy; (c) that at the conclusion of all the evidence the court will make an explicit determination for the record regarding the admissibility of the statement; and (d) that if the court determines that the government has failed to carry the burden delineated in (b) above, the court will, upon appropriate motion, declare a mistrial, unless a cautionary instruction to the jury to disregard the statement would suffice to cure any prejudice.

*Bell*, 573 F.2d at 1044. "The foregoing procedural steps should transpire out of the hearing of the jury."[3] *Id.* (citing Fed. R. Evid. 104(c)).

Defendants are concerned that "[t]he [Government's] motion identifies no particular exhibit number, no declarant-by-declarant showing, and no date range of membership" and that the Government's proposed curative measures, which include an instruction to disregard or a mistrial, "are a poor remedy after weeks of testimony." ECF No. 156 at 14. Defendants therefore request that

> the government be required to identify, in advance, each statement it intends to offer under Rule 801(d)(2)(E) by exhibit number, declarant, and date, the independent evidence on which is relies to establish that the declarant was a member of a conspiracy with the defendant against whom the statement is offered as of that date, and the respect in which the statement furthered the conspiracy.

*Id.* at 14–15. I do not understand *Bell* to include this requirement and decline to impose this burden on the Government here. The Government's Motion in Limine Regarding Coconspirator Statements [ECF No. 155] will therefore be granted, and per the *Bell*

[3] *Bell* also clarifies the steps that follow a ruling that a co-conspirator statement is admissible. *See Bell*, 573 F.2d at 1044. After ruling that the statement is admissible, "the court may submit the case to the jury" and "should not charge the jury on the admissibility of the coconspirator's statement." *Id.* "The court . . . should, of course, instruct that the government is required to prove the ultimate guilt of the defendant beyond a reasonable doubt." *Id.* The court should also provide "[a]n appropriate instruction on credibility . . . and the jury should be cautioned with regard to the weight and credibility to be accorded a coconspirator's statement." *Id.*

procedure, statements made by Luthor, Brown, and their alleged co-conspirators J.W., C.A., R.K., and D.C. will be conditionally admitted.

*Defendants' Joint Motion in Limine 1*

Defendants move to exclude evidence of Luthor's prior criminal convictions, as well as a fraudulent loan application allegedly submitted by Luthor. ECF No. 133. The Government objects. ECF No. 157 at 1–9. Defendants' motion will be granted as to Luthor's prior convictions but denied as to the allegedly fraudulent loan application.

Begin with Luthor's prior convictions. In 2010, Luthor, also known as Gabriel Adam Alexander Langford, was convicted of four separate instances of Financial Transaction Card Fraud. *See Minnesota v. Langford*, No. 66-CR-09-2403 (Minn. Dist. Ct.) (Case Details listing offense date as 06/28/2009 and conviction date as 02/08/2010); *Minnesota v. Langford*, No. 19HA-CR-09-3339 (Case Details listing offense date as 06/04/2009 and conviction date as 03/16/2010); *Minnesota v. Langford*, 19HA-CR-09-3366 (Minn. Dist. Ct.) (Case Details listing offense date as 06/01/2009 and conviction date as 3/16/2010); *Minnesota v. Langford*, No. 46-CR-09-791 (Minn. Dist. Ct.) (Case Details listing offense date as 06/25/2009 and conviction date as 03/22/2010). The Government intends to offer these prior convictions pursuant to Federal Rule of Evidence 404(b) "to show that Luthor acted with intent, knowledge, as part of a plan, and that there was an absence of mistake and a lack of an accident with regard to his participation in the [Golden Victory Medical] fraud scheme." ECF No. 133-1 at 2. Defendants argue that the

convictions constitute improper propensity evidence and are too dissimilar and remote. ECF No. 133 at 6–10. I agree with Defendants.

"Rule 404(b)(1) prohibits use of a defendant's prior act to prove his character in order to show that on a particular occasion he acted in accordance with the character." *United States v. Bartunek*, 969 F.3d 860, 862 (8th Cir. 2020); *see* Fed. R. Evid. 404(b)(1). But the "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Eighth Circuit has held that if the evidence is "(1) relevant to a material issue, (2) similar in kind and not overly remote in time to the crime charged, (3) supported by sufficient evidence to support a jury finding that the defendant committed the prior act, and (4) of probative value not substantially outweighed by its prejudicial effect," it may be admitted under 404(b)(2). *United States v. Proto*, 91 F.4th 929, 932 (8th Cir. 2024).

Evidence of Luthor's prior convictions will be excluded because it fails at least the second factor of the Eighth Circuit's test: Luthor's prior convictions are too dissimilar to the charged wire fraud and money laundering. The Eighth Circuit's similarity test "merely requires that the prior acts are 'sufficiently similar to support an inference of criminal intent.'" *United States v. Williams*, 796 F.3d 951, 959 (8th Cir. 2015) (quoting *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006)). "[T]he prior acts need not be 'duplicates.'" *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995) (citing *United States v. Burkett*, 821 F.2d 1306, 1309 (8th Cir. 1987). But here, Luthor's prior convictions

all concerned, as Defendants point out, "obtaining credit card information, creating a credit card and purchasing a few small items from retailers." ECF No. 133 at 8. Although these prior convictions also involved "fraud," the wire fraud alleged here is much more complex. The wire fraud occurred over multiple years, was concentrated on medical billing, concerned a federal program, and involved a licensed medical practice.

The Government claims this case is like *United States v. Edelmann*, where, according to the Government, "[t]he common thread was fraud and forgery, but that was about it." ECF No. 157 at 5–6 (citing *United States v. Edelmann*, 458 F.3d 791, 809–10 (8th Cir. 2006)). But in *Edelmann*, the prior fraud was similar to the charged fraud. The Eighth Circuit explained that "[j]ust as [defendant] was charged with filing false tax returns and IRS documents in the present case, so too did [defendant's] first two prior convictions involve her filing a false Currency Transaction Report to conceal her identity to the IRS." 458 F.3d at 810. The court also noted that defendant's "third prior conviction for fabricating court orders to escape from federal custody demonstrates the *same method of deception* she used in the present case." *Id.* (emphasis added). Here, unlike in *Edelmann*, Luthor's prior method of deception consisted of fraudulent credit card charges. This is dissimilar to the method of deception charged here, which consists of fraudulent medical billing and money laundering.

In addition to highlighting the dissimilarity between Luthor's prior convictions and the charged offenses, Defendants point to the age of Luthor's convictions and assert that because the convictions are seventeen years old, the convictions are too remote. ECF No.

133 at 9–10. The Government notes that only eight years passed between Luthor's 2010 convictions and GVM's formation in 2018. ECF No. 157 at 6–7. But a gap of only eight years is still insufficient to overcome the dissimilarity to the charged conduct here. *See United States v. Cook*, 454 F.3d 938, 941–42 (8th Cir. 2006). In *Cook*, a defendant was charged with cocaine distribution, and the district court excluded evidence of the defendant's prior marijuana-possession conviction. *Id.* at 941–42. The Eighth Circuit explained that the "prior mere possession offense was six years remote *and* it was *functionally* dissimilar to the charged distribution offense" *Id.* The court stated that "[i]n these circumstances, [it had] no difficulty concluding that the district court did not abuse its discretion in concluding that this conviction's very minimal probative value was substantially outweighed by the danger of unfair prejudice." *Id.* The *Cook* court's concerns about prejudice are present here, given the dissimilarity and relative remoteness of Luthor's prior convictions. I therefore conclude that Luthor's prior convictions are inadmissible under Rule 404(b), and Defendants' Joint Motion in Limine Prohibiting the Admission of 404(b) Evidence [ECF No. 133] will be granted to the extent it seeks to exclude Luthor's prior convictions.

Separately, the Government seeks to admit evidence that Luthor "submitted and aided and abetted the submission of a fraudulent loan application to Alliant Credit Union to purchase a[n] . . . RV in Fresno, California." ECF No. 133-1 at 2. This alleged fraud occurred in April 2023, "during Luthor's trip around the United States to [allegedly] avoid law enforcement scrutiny of the scheme." ECF No. 133-1 at 2; *see also* ECF No. 157 at

7–8. The Government argues that this evidence is intrinsic. *See* ECF No. 133-1 at 2; ECF No. 157 at 7–8. Defendants contend the evidence lacks "any nexus to the charged scheme" and would result in a mini-trial and confuse the jury. ECF No. 133 at 11. I agree with the Government.

"Intrinsic evidence is evidence of wrongful conduct other than the conduct at issue offered for the purpose of providing the context in which the charged crime occurred." *United States v. Guzman*, 926 F.3d 991, 999–1000 (8th Cir. 2019) (citation modified). Intrinsic evidence includes "evidence that merely completes the story or provides context to the charged crime." *Id.* at 1000 (citation modified). The evidence "need not be necessary to the jury's understanding of the issues to be admissible." *Id.* (citation modified). Intrinsic evidence is subject to Rule 403 balancing, but the "[d]istrict courts have 'broad discretion' in admitting intrinsic evidence and [will be] reverse[d] 'only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *Id.* (quoting *United States v. Thomas*, 760 F.3d 879, 883 (8th Cir. 2014)).

The Government explains that defendants traveled "from Minnesota to California, back to Montana, up through Canada, and into Alaska" after "CMS had suspended GVM's ability to bill Medicare." ECF No. 157 at 2. Luthor allegedly submitted the RV loan application in 2023, while on this cross-country trip, and purchased an RV in California, *see id.* at 2–3, that he "rode around in . . . for the better part of the year after the purchase," *id.* at 9. This allegedly fraudulent loan application provides context for the conclusion of

the charged wire fraud scheme. The loan application evidence may therefore be admitted as intrinsic evidence. Defendants' Joint Motion in Limine Prohibiting the Admission of 404(b) Evidence [ECF No. 133] as to this issue will be denied.

*Defendants' Joint Motion in Limine 2*

Defendants move to exclude evidence "concerning the [D]efendants' relationship, personal lifestyle, or private interpersonal conduct" under Federal Rules of Evidence 401, 403, and 404(b). ECF No. 134 at 1. Specifically, Defendants seek to exclude evidence of their alleged "polyamorous lifestyle," such as testimony about Defendants' relationships and sexual activities, references to individuals as "girlfriends" or "boyfriends," and evidence related to Defendants' living arrangements or cohabitants. ECF No. 134 at 1, 3. Relatedly, Defendants would exclude evidence of inflammatory characterizations of Defendant Luthor's lifestyle, such as him "being called 'the pimp,' maintaining multiple girlfriends, spending lavishly at strip clubs, and controlling women through money, drugs, and alcohol." *Id.* at 4.

Federal Rule of Evidence 404(b) generally excludes evidence of a defendant's prior acts to establish their propensity to act in conformance with a certain character trait. However, Rule 404(b) "does not apply to evidence intrinsic to the charged offense." *United States v. Guzman*, 926 F.3d 991, 999 (8th Cir. 2019) (citation modified). "Intrinsic evidence is evidence of wrongful conduct other than the conduct at issue offered for the purpose of providing the context in which the charged crime occurred." *Id.* at 999–1000 (citation modified). Intrinsic evidence includes "evidence that merely completes the story

or provides context to the charged crime." *Id.* at 1000 (citation modified). Further, the evidence does not need to be "necessary to the jury's understanding of the issues to be admissible." *Id.* (citation modified). Intrinsic evidence is subject to Rule 403 balancing, but "[d]istrict courts have 'broad discretion' in admitting intrinsic evidence and [will be] reverse[d] 'only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *Id.* (quoting *United States v. Thomas*, 760 F.3d 879, 883 (8th Cir. 2014)).

Here, Rule 404(b) does not apply because evidence of Defendants' lifestyle and relationships is entangled with the charged offenses. The Government alleges that Luthor and Brown were in a romantic relationship when they formed GVM. ECF No. 149 at 7. Luthor allegedly had romantic relationships with multiple women simultaneously, at least one of whom (J.W.) performed work for GVM, *id.*, is alleged to have collaborated with Brown in GVM's false billing, *see id.* at 18, and lived with Luthor and Brown during GVM's operation, *see* ECF No. 157 at 10. The Government alleges that, except for Brown, Luthor's girlfriends did not earn a salary from GVM but benefited from the fraud by living with Luthor and Brown in their Eden Prairie mansion and receiving other luxuries. *See id.* at 11. Evidence of these relationships' romantic character thus elucidates the interpersonal ties between the Defendants and others that helped to drive the alleged scheme. Moreover, the Government intends to introduce witness testimony indicating that Defendants' relationships and lifestyle were part of what initially led witnesses to tip off investigators about potential fraud at GVM. *See id.* at 21–22. Defendants' relationships and lifestyle

are sufficiently intertwined with the charged offenses such that omitting any mention of them would result in confusion. And while certain details of Defendants' relationships may be prejudicial, not introducing any explanation of the relationships might just as easily lead to even greater speculation and prejudice about the nature of the relationships. For these reasons, Defendants' Joint Motion in Limine to Exclude Testimony Related to Relationship and Lifestyle [ECF No. 134] will be denied.

Like evidence of wealth or control, there is a point at which evidence of Defendants' relationships and lifestyle could become needlessly cumulative. The Government will be permitted to offer evidence that Luthor and Brown were in a romantic relationship, that Luthor had romantic relationships with other women simultaneously, and that Luthor and Brown employed, provided for, and cohabitated with these women. The Government is forewarned not to introduce cumulative evidence of such facts.

*Defendants' Joint Motion in Limine 4*

Defendants move to exclude testimony "related to Ms. Brown's 2020 Nevada State Board of Nursing matter and allegations about improper billing at Ms. Brown's prior employer in Nevada." ECF No. 136 at 1. Defendants argue that this testimony lacks foundation, is irrelevant, constitutes propensity evidence, and risks confusing the jury. ECF No. 136 at 1. The Government opposes. ECF No. 157 at 13–17. This motion will be denied.

As an initial matter, the Government does not seek to admit this evidence under Federal Rule of Evidence 404(b). It says the evidence is intrinsic because the "nursing

board proceedings relate to the 2018 genesis of GVM and the outset of the fraud in conjunction with Brown's work for D.F., a Nevada family practice provider." ECF No. 157 at 13. I agree that the nursing board proceedings and related allegations provide context for the charged wire fraud and are intrinsic. *See United States v. Guzman*, 926 F.3d 991, 999–1000 (8th Cir. 2019) ("Intrinsic evidence is evidence of wrongful conduct other than the conduct at issue offered for the purpose of providing the context in which the charged crime occurred." (citation modified)). The nursing board proceedings and related allegations are therefore not impermissible propensity evidence under Rule 404(b).

Defendants argue that "the Nursing Board matter and allegations of improper billing both fail Rule 401's threshold relevance requirement." ECF No. 136 at 3. Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "[E]vidence relevance is a low bar." *Cottrell ex rel. Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 997 (8th Cir. 2016). Evidence that is not relevant is inadmissible at trial. Fed. R. Evid. 402. And relevant evidence may be excluded when "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

The Government identifies four ways in which evidence of the nursing board proceedings and related allegations are relevant. Addressed in turn, each of these points is persuasive.

(1) The Government contends that the nursing board proceedings and related allegations are relevant to whether Brown knew it was impermissible to delegate mental health services. ECF No. 157 at 16. I agree. After Brown's employer, D.F., submitted a complaint to the nursing board, Brown was sanctioned by the nursing board "for practicing and billing for mental-health work without a license to do so." *See id.* This, along with other admitted evidence, might reasonably lead a juror to conclude that Brown knew her employees could not provide and bill for mental health services without a license.

(2) The Government argues that "D.F.'s observations of Brown's conduct with her patients and D.F.'s allegations of fraud against Brown are relevant" because they go to whether "Brown's continued [allegedly] false billing was knowing and intentional, not a business mistake or an accident." *Id.* at 16. The Government explains that D.F.'s allegations "put Brown on notice in 2019 as to concerns about Brown's billing practices." *Id.* at 16. Again, I agree. As with the nursing board proceedings, evidence that D.F. identified allegedly problematic billing and took steps to address these concerns might reasonably lead a juror to conclude that Brown knew that her billing practices were improper and yet continued to bill in the same manner.

(3) The Government also claims that "the temporal proximity between D.F.'s complaint and Qlarant flagging Brown's billing is together probative of fraud." *Id.* at 16. Qlarant is "a Medicare contractor" that also raised concerns about Brown's billing. *See id.* at 15. Qlarant's concerns "resulted in a referral to the Department of Health and Human Services' Office of Inspector General," which "kick[ed] off the federal law enforcement

investigation of Luthor and Brown." *Id.* at 15–16. According to the Government, GVM, "began performing neurofeedback for D.F.'s patients" in 2018. *Id.* at 13. D.F. submitted the complaint to the nursing board "at the beginning of 2019." *Id.* at 14. And Qlarant's concerns arose around the same time, "in late 2018 or the beginning of 2019," *id.* at 15, which is when the Government alleges Defendants' fraud scheme began. As the Government identifies, this evidence tends to show that more than one entity was concerned about Brown's billing practices in 2018 and 2019 and put her on notice regarding the problematic nature of these billing practices.

(4) Finally, the Government contends that "D.F.'s complaint to the Nevada Board" is part of the GVM fraud story and, therefore, the nursing board proceedings and related allegations are relevant because they provide context for "how GVM began, how Brown learned a mental-health license is necessary to providing and [sic] neurofeedback therapy, and how Qlarant tipped off HHS-OIG to look into Brown." *See id.* at 17. This is also persuasive.

Defendants argue that the nursing board proceedings and related allegations should be excluded because they are "more prejudicial than probative" and will confuse jurors and create a minitrial. ECF No. 136 at 3–4. But Defendants will have the opportunity to clarify and advocate their position through witness examination and argument, thus minimizing the risks of unfair prejudice and juror confusion. Because the nursing board proceedings and related allegations are intrinsic and relevant, this evidence may be admitted.

Defendants' Joint Motion in Limine to Exclude Testimony Related to Ms. Brown's Nevada Nursing Board Reprimand and Related Allegations [ECF No. 136] will be denied.

*Defendants' Joint Motion in Limine 6*

Defendants move to preclude the Government from referencing "victims," "fraud," "scams," or "other legally conclusory terms" in evidence, testimony, or argument presented to the jury. ECF No. 138 at 1, 4–5. According to Defendants, such references constitute unfairly prejudicial legal-conclusion evidence under Federal Rule of Evidence 403, violate Federal Rule of Criminal Procedure 16(a)(1)(G)'s expert-disclosure requirements by "eliciting the functional equivalent of expert testimony . . . from a lay witness under the guise of ordinary perception," and improperly constitute opinion testimony that embodies a legal conclusion in violation of Federal Rules of Evidence 701, 702, and 704. *See id.* at 2–4.

Defendants' motion will be denied for two reasons. First, the objected-to word "fraud" is embedded in the charged wire-fraud offenses and in the elements the Government undisputedly is required to prove at trial. Specifically, Defendants are charged with six counts of wire fraud in violation of 18 U.S.C. § 1343, which requires the Government to prove that Defendants: (1) voluntarily and intentionally devised (or participated in) a scheme to defraud another out of money by means of material false representations or promises; (2) did so with the intent to defraud; and (3) used, or caused to be used, an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme. *See* 8th Cir. Crim. Jury Instr. 6.18.1343 (2025); *see*

*also* ECF No. 131 at 50 (Defendants' Joint Proposed Jury Instructions); ECF No. 152 at 5 (Government's Proposed Jury Instructions). Precluding the Government from using the word "fraud" would prevent the Government from listing the elements of the offense or even naming the offense itself. Second, Defendants do not address any particular evidence that contains the objected-to terms, and their objection to "other legally conclusory terms" is too vague and uncertain to meaningfully rule on whether such testimony should be excluded or admitted. Considered in the abstract, if lay witnesses use the objected-to terms at trial, Defendants will have the opportunity to cross-examine the witnesses about the bases for their perceptions that these terms applied. For these reasons, Defendants' Joint Motion in Limine to Restrict Legal Conclusions [ECF No. 138] will be denied.

*Defendants' Joint Motion in Limine 12*

Defendants move to preclude the Government from presenting figures of the aggregate loss tied to the charged offenses and from presenting evidence of certain insurance claims not directly tied to the charged wires. ECF No. 144. Defendants argue that, while at least some of this evidence is intrinsic to the offenses charged, some of it must be impermissible other-acts evidence under Rule 404(b). *Id.* at 3. As best I can tell, all the evidence referenced in Defendants' motion is intrinsic to the charged offenses. Defendants do not explain with any specificity why they believe that's not the case or where a line might appropriately be drawn. For these reasons, Defendants' Joint Motion in Limine Regarding Uncharged Claims and Aggregate Loss [ECF No. 144] will be denied.

*Defendants' Joint Motion in Limine 13*

Defendants move to exclude or limit the testimony of the Government's proffered Medicare fraud expert, Daniel Coney. ECF No. 145. Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if that testimony will "help the trier of fact" in determining an issue in the case. Before admitting expert testimony, the district court must ensure that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "But the rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023) (citation modified). To be qualified to testify as an expert on a subject, "the area of the witness's competence [must] match the subject matter of the witness's testimony." *Shipp v. Murphy*, 9 F.4th 694, 701 (8th Cir. 2021) (citation modified). That said, expert testimony need only advance the jury's understanding "to any degree" to satisfy Rule 702. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility. And the weight given to witness testimony is the province of the jury." *Perry*, 61 F.4th at 606 (citation modified).

Daniel Coney is a Fraud Investigations Advisor specializing in Medicare and Medicaid for SafeGuard Services, LLC. In this role, he "provides forensic examinations, assists with case development, and provides trial support for the Department of Justice and

U.S. Attorney's Offices." ECF No. 145-1 at 10 (citation modified). Prior to this role, Mr. Coney spent over 30 years as a federal agent investigating complex financial fraud cases, including 13 years (1991-2004) with the U.S. Department of Health and Human Services uncovering provider fraud in the Medicare and Medicaid programs. *Id.* at 12–13. In his role with the Department of Health and Human Services, Mr. Coney investigated numerous instances of alleged fraudulent billing by medical providers, including instances where providers submitted claims to Medicare for services different than those provided or for services that were never provided at all. *See id.* at 13. Mr. Coney holds certifications in medical billing, medical coding, and healthcare compliance. *Id.* at 10.

As an initial matter, Defendants object to the Government's failure to comply with the disclosure requirements of Federal Rule of Criminal Procedure 16. ECF No. 145 at 12–14. I addressed this objection in a separate order [ECF No. 167], and the Government has since cured the disclosure's deficiencies. See ECF No. 172 at 9–17[4] for the opinions the Government intends to elicit from Mr. Coney at trial. Based on the Government's disclosures, the testimony of Mr. Coney is admissible under Rule 702. Defendants' principal objection is that Mr. Coney is not qualified to offer testimony about medical billing or coding or to apply "any billing or coding rule to any service or claim in this case." ECF No. 145 at 11. They point out that Mr. Coney obtained his certifications in billing and coding only recently. *Id.* at 9. While that may be true, Mr. Coney's qualification as an

---

4 Citations to ECF No. 172 in this Order reference the Government's page numbering in its Supplemental Notice of Expert Witness Daniel Coney that begins on page 2 of ECF No. 172.

expert is not tied solely to his certifications. He also has over a decade's worth of experience investigating Medicare billing fraud, the precise form of fraud alleged against Defendants. Moreover, the Government's disclosures draw sufficient links between Mr. Coney's experience and his opinions, such that I am persuaded that his testimony would help the jury understand the complex evidence in this case, namely Medicare coverage and billing generally and the specific billing data and patterns at issue in this case.

Defendants' remaining objections to Mr. Coney's testimony are unpersuasive. Defendants argue that Mr. Coney's testimony will violate Federal Rule of Evidence 704(b) by offering an opinion regarding Defendants' mental states or by otherwise telling the jury what result to reach. *See* ECF No. 145 at 5–6. But nothing in the Government's disclosures indicates that Mr. Coney will testify regarding the Defendants' mental states or that GVM's billing practices were in fact fraudulent. *See* ECF No. 172 at 9–17. Instead, the Government indicates that Mr. Coney will primarily apply his knowledge of Medicare billing and coding to patterns he identified in GVM's billing practices. *See, e.g.*, ECF No. 172 at 14 ("Mr. Coney will testify that GVM used modifier 59 at a higher-than-expected frequency and GVM would not have been able to bill as many code combinations without the use of modifiers like modifier 59."). Nor do Mr. Coney's title, credentials, or accomplishments as a fraud investigator tell the jury what result to reach such that his testimony must be excluded under Rule 403, as Defendants argue. *See* ECF No. 145 at 7. It's within the province of the jury to weigh Mr. Coney's credentials and testimony against other evidence offered at trial, including the Defendants' cross-examination of Mr. Coney.

And I cannot say that the risk of prejudice stemming from Mr. Coney's credentials alone is so great that it substantially outweighs the potential for Mr. Coney's testimony to help the jury understand the issues in the case. Defendants' objection that Mr. Coney stands to serve only as a "summary witness or as the narrator of the Government's theory," *id.* at 14, is similarly unavailing and is mooted by the Government's disclosures. For these reasons, Defendants' Joint Motion in Limine to Exclude and Limit the Expert Testimony of Daniel Coney [ECF No. 145] will be denied.

*Defendants' Joint Motion in Limine 14*

Defendants move to exclude or limit the testimony of the Government's proffered neurofeedback expert, Dr. Leslie Sherlin. ECF No. 146. Dr. Sherlin is Assistant Professor of Psychology at Ottawa University in Surprise, Arizona. ECF No. 145-1 at 55. He also serves as adjunct faculty at numerous other universities, teaching coursework in psychology, psychological testing, neurofeedback, and biofeedback. *Id.* at 55–56. He holds a Doctor of Philosophy in the areas of Psychology, Sports Psychology, and Clinical Pastoral Counseling. *Id.* at 53. He is a Licensed Professional Counselor in Arizona and holds certifications in neurofeedback and biofeedback from the Biofeedback Certification International Alliance. *Id.* at 54. Dr. Sherlin possesses experience as a neurofeedback

provider[5], *see id.* at 57–58, 59, as well as experience supervising students in administering neurofeedback, *see id.* at 57. He has published numerous articles and given numerous lectures on neurofeedback and biofeedback and their application in clinical settings. *See id.* at 62–78.

The Government's expert disclosure[6] explains that Dr. Sherlin intends to offer the following opinions:

> 1. That best practices for ethical billing for neurofeedback include: (a) documenting the length of neurofeedback sessions, (b) avoiding "unbundling" or adding codes which represent components already accounted for in the neurofeedback session, (c) distinguishing billing for sessions focused substantially on psychotherapy counseling from neurofeedback sessions, and (d) avoiding creative coding, upcoding, and billing CPT codes inconsistent with the therapy provided.
>
> 2. That Medicare does not broadly cover neurofeedback or biofeedback used for treatment of psychosomatic conditions, and biofeedback is generally only covered by Medicare in narrow circumstances such as biofeedback for urinary incontinence.

---

[5] The Government's disclosure indicates that "Dr. Sherlin has 24 years of experience as a Neurofeedback Practitioner." ECF No. 145-1 at 7. It's somewhat unclear precisely where in Dr. Sherlin's CV the Government draws its support for that assertion, but Dr. Sherlin's CV does indicate that he provided "EEG analysis service and client services" or similar for patients from at least March 2002 to December 2009 in Scottsdale, Arizona and then in Burbank, California, and that he has since worked as a Licensed Professional Counselor providing "practical education in psychophysiology and self regulation techniques" as well as "clinical counseling services." *Id.* at 57–58, 59.

[6] The Government's disclosure as to Dr. Sherlin does not suffer the same deficiencies as Mr. Coney's disclosure. *See* ECF No. 145-1 at 8 (providing Dr. Sherlin's opinions and explaining that he will testify "based on his experience as a Neurofeedback practitioner"). Defendants' objection to Dr. Sherlin's testimony under Federal Rule of Criminal Procedure 16 is therefore unavailing. *See* ECF No. 146 at 11–14.

> 3. That neurofeedback practitioners should assume that neurofeedback is not covered by Medicare and that providers should not attempt to camouflage neurofeedback for purposes of Medicare billing.
>
> 4. That practitioners supervising neurofeedback performed by nonphysician practitioners or unlicensed technicians should be physically present and immediately available during the treatment.

*Id.* at 8–9.

Defendants' principal objection to Dr. Sherlin's testimony is that he is unqualified to testify about coding and billing because he has no training or certifications in coding or billing. ECF No. 146 at 10. Defendants would therefore have the court exclude testimony from Dr. Sherlin regarding medical billing or coding. *Id.* Defendants' reasoning is unavailing. "[A]n individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). Here, where Dr. Sherlin has extensive experience as a clinical psychologist and neurofeedback provider and supervisor, he would necessarily be knowledgeable about insurance and billing related to neurofeedback rendered in a clinical setting. Medicare billing privileges are tied to providers, often individual practitioners or physicians, not to individual coders or billers. *See generally* 42 C.F.R. §§ 424.500–424.505; *see also Goffney v. Becerra*, 995 F.3d 737, 740 (9th Cir. 2021) ("To be paid for performing Medicare services, healthcare providers must enroll in the program, at which point they receive billing privileges and a billing number."). And because "[b]illing

privileges are not permanent" and can be "revoked or deactivated" by Medicare, *id.*, providers have a specific interest in understanding billing and Medicare compliance. Dr. Sherlin has established his knowledge of neurofeedback coding and billing through years of experience, which is sufficient to qualify him as an expert on those topics. Moreover, I find that Dr. Sherlin's testimony would be useful in helping the jury understand neurofeedback practices and standards and billing for neurofeedback.

Defendants' other objections to Dr. Sherlin's testimony are similarly unpersuasive. Defendants argue that Dr. Sherlin's testimony will violate Federal Rule of Evidence 704(b) by offering an opinion on the Defendants' mental states or by otherwise telling the jury what result to reach. *See* ECF No. 146 at 5–7. Defendants acknowledge that an expert may "describe general practices, or what is typical of a category of people, so long as the expert stops short of opining about the defendant." *Id.* at 6 (citing *Diaz v. United States*, 602 U.S. 526 (2024)). But they argue that "[t]he [Government's] Notice [] does not describe general testimony of that kind." *Id.* I disagree. The Government's disclosure indicates that Dr. Sherlin will state his opinions about ethical billing for neurofeedback and how neurofeedback practitioners should handle Medicare coverage and billing. His proposed testimony does not indicate that he'll opine that the conduct of either Defendant evinces fraud or intent. Moreover, Defendants will have the opportunity to cross-examine Dr. Sherlin and offer evidence that contradicts his opinions about billing best practices. For these reasons, Dr. Sherlin's testimony does not present a Rule 704(b) problem.

Defendants' Joint Motion in Limine to Exclude and Limit Expert Testimony of Leslie Sherlin [ECF No. 146] will be denied.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Government's Motion in Limine 1 Regarding Wealth Evidence and Evidence of Luthor Control and Power Over Brown and Others [ECF No. 154] is **GRANTED** subject to the limitations described in this Order.

2. Government's Motion in Limine 2 Regarding Co-Conspirator Statements [ECF No. 155] is **GRANTED**.

3. Defendants' Joint Motion in Limine 1 Prohibiting the Admission of 404(b) Evidence [ECF No. 133] is **GRANTED** as to evidence of Luthor's prior convictions and is **DENIED** as to evidence of the allegedly fraudulent RV loan application.

4. Defendants' Joint Motion in Limine 2 to Exclude Testimony Related to Relationship and Lifestyle [ECF No. 134] is **DENIED** subject to the limitations described in this Order.

5. Defendants' Joint Motion in Limine 4 to Exclude Testimony Related to Ms. Brown's Nevada Nursing Board Reprimand and Related Allegations [ECF No. 136] is **DENIED**.

6. Defendants' Joint Motion in Limine 6 to Restrict Legal Conclusions [ECF No. 138] is **DENIED**.

7. Defendants' Joint Motion in Limine 12 regarding Uncharged Claims and Aggregate Loss [ECF No. 144] is **DENIED**.

8. Defendants' Joint Motion in Limine 13 to Exclude and Limit the Expert Testimony of Daniel Coney [ECF No. 145] is **DENIED**.

9. Defendants' Joint Motion in Limine 14 to Exclude and Limit Expert Testimony of Leslie Sherlin [ECF No. 146] is **DENIED**.

Dated: October 28, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court